## IN THE UNITED STATES COURT OF APPEALS
### FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
July 16, 2013

No. 12-10592

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

KENNETH WAYNE BROWN; LEAH MICHELE BROWN,

Defendants - Appellants

Appeals from the United States District Court
for the Northern District of Texas

Before ELROD and HIGGINSON, Circuit Judges, and MARTINEZ, District Judge.[*]

HIGGINSON, Circuit Judge:

In this direct appeal, Kenneth and Leah Brown challenge the sufficiency of the evidence supporting their federal jury trial convictions for conspiracy to commit theft from a program receiving federal funds, as well as the procedural and substantive reasonableness of their within-Guidelines sentences. Concluding that the evidence is sufficient to support their convictions, and that their sentences are procedurally and substantively reasonable, we AFFIRM.

---

[*] District Judge of the Western District of Texas, sitting by designation.

No. 12-10592

## BACKGROUND

Kenneth and Leah Brown were charged in a single-count superseding indictment with conspiracy to commit theft from a program receiving federal funds, in violation of 18 U.S.C. §§ 371, 666(a)(1)(A). The indictment alleged that the Browns conspired with Patricia Leathers and others to defraud the City of Garland, Texas. Between 1999 and 2008, Leathers worked as an in-house property and casualty claims adjuster for the City of Garland. In that capacity, Leathers was responsible for investigating claims for property damage against the City, evaluating the City's liability, and negotiating claim settlements. During that period, Leathers used her position to prepare false claims and to direct the City to issue settlement checks for up to $10,000, the ceiling of her authority to settle claims and authorize disbursements without supervisory approval. By the time the conspiracy was detected, Leathers had issued checks for hundreds of fraudulent claims resulting in a loss to the City of approximately $1.9 million.

The indictment details that the Browns facilitated the check-cashing scheme by submitting false insurance claims to the City of Garland for reimbursement; fraudulently obtaining checks issued by the City of Garland and made payable to Kenneth Brown, Leah Brown, and their friends and relatives; endorsing the checks; cashing the checks or depositing them at banks where the defendants or their co-conspirators held accounts; and sharing the proceeds. The indictment specifically alleges that Leah Brown endorsed her name on the back of two checks, totaling $11,275, and that "at least fourteen checks totaling more than $102,000.00 were endorsed and negotiated by Kenneth Brown." The Browns pleaded not guilty to the indictment and proceeded to a jury trial.

The trial lasted four days. The government called fourteen witnesses in its case-in-chief: Robby Neill, the risk manager for the City of Garland; Steven Anderson, the accounting manager for the City of Garland; Matt Ladis, a

No. 12-10592

detective for the Garland Police Department; Sheila Powell, an auditor for the United States Attorney's Office for the Northern District of Texas; Beth Huntley, a forensic accountant with the Federal Bureau of Investigation ("FBI"); Jennifer Mullican, a Special Agent with the FBI; and Jerry Diviney, Melissa Williams, Mark Enloe, Joshua Clay, Duane Stailey, Angie Smith, Crystal Thompson, and Brent Estep, co-conspirators and others involved in the check-cashing scheme. The defense did not call any witnesses. The jury returned guilty verdicts against both defendants on the sole count charged.

The district court sentenced the Browns together in a joint hearing. The court sentenced Kenneth Brown to forty-two months of imprisonment, the midpoint of his Guideline range, followed by two years of supervised release. The court sentenced Leah Brown to thirty-four months of imprisonment, the midpoint of her Guideline range, followed by two years of supervised release. Additionally, the court ordered both defendants to pay restitution to the City of Garland, for which they are jointly and severally liable with their co-conspirators. The Browns filed timely notices of appeal.

## DISCUSSION

The Browns argue on appeal that the evidence was insufficient to support their convictions for conspiracy to commit theft from a federally funded program and that their sentences are procedurally and substantively unreasonable.

### I.     Sufficiency challenges

The Browns were convicted of a single count of conspiracy to commit theft from a program receiving federal funds. The substantive offense of theft from a program receiving federal funds makes it a crime for an "agent" of an "organization," "government," or "agency" that "receives, in any one year period, benefits in excess of $10,000 under a Federal program," to embezzle, steal, obtain by fraud, or otherwise without authority knowingly convert or intentionally misapply "property" "that is valued at $5,000 or more" and "is

owned by, or is under the care, custody, or control of such organization, government, or agency." 18 U.S.C. § 666(a)–(b); Fifth Circuit Pattern Jury Instructions (Criminal Cases) § 2.37A (2012); *United States v. Ollison*, 555 F.3d 152, 159 (5th Cir. 2009). "In short, . . . there must be an individual who acts as an agent of an organization, the individual must have unlawfully obtained funds from this organization, and the organization must receive over $10,000 in federal funds in any one year period." *United States v. Abu-Shawish*, 507 F.3d 550, 556 (7th Cir. 2007).

To obtain convictions against Kenneth and Leah Brown for conspiracy to commit that offense, the government was required to prove beyond a reasonable doubt that each of the Browns entered into an agreement with at least one other person to commit theft from a program receiving federal funds, knowing the purpose of the agreement and joining in it willfully, and one of the conspirators knowingly committed an overt act in furtherance of the conspiracy. 18 U.S.C. § 371; Fifth Circuit Pattern Jury Instructions (Criminal Cases) § 2.20 (2012); *United States v. Read*, 710 F.3d 219, 226 (5th Cir. 2012) (per curiam).

On appeal, the Browns contend that the evidence adduced at trial was insufficient to support their convictions. Specifically, they argue that the government failed to establish the "federal funds," "nexus," and "knowledge" elements. *See* discussion *infra* Parts I.A, I.B, I.C. Our standard of review of those challenges hinges on whether they were properly preserved.

At the close of the government's case-in-chief, counsel for Kenneth Brown and counsel for Leah Brown separately moved for judgment of acquittal under Federal Rule of Criminal Procedure 29(a). Kenneth Brown "move[d] for judgment of acquittal on the grounds that there is insufficient evidence to establish the elements of knowingly and willfully." Leah Brown began by specifically challenging the knowledge element—"we move for a judgment of acquittal on behalf of Ms. Leah Brown on the grounds that there's insufficient

evidence of intentionally, knowingly, willfully"—but went on to challenge, more broadly, that "the Government has wholly failed to establish all of the elements necessary for conviction under conspiracy." The district court denied both motions.

Kenneth Brown specifically preserved his sufficiency challenge to the knowledge element by filing a timely motion for judgment of acquittal, and, accordingly, our review of that challenge is *de novo. Read*, 710 F.3d at 226. But because he asserted "*specific grounds* for a specific element of a specific count for a Rule 29 motion," Kenneth Brown failed to preserve sufficiency challenges to the "federal funds" and "nexus" elements, *United States v. Herrera*, 313 F.3d 882, 884 (5th Cir. 2002) (en banc) (per curiam); accordingly, our sufficiency review of those elements is for "manifest miscarriage of justice," *United States v. McDowell*, 498 F.3d 308, 312 (5th Cir. 2007). Leah Brown, by contrast, objected that the government failed to establish all of the elements of the conspiracy offense. Because a general challenge to the sufficiency of the evidence preserves *de novo* review as to all potential sufficiency issues, our review of her challenge to each of the elements of the offense is *de novo. See Herrera*, 313 F.3d at 885 n.* (ruling that a defendant who "chose to make a quite specific, *not a general*, motion for judgment of acquittal" did not preserve his sufficiency objection as to all elements of the crime).

In reviewing *de novo* the sufficiency of the evidence, we ask whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Cooper*, 714 F.3d 873, 880 (5th Cir. 2013) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In reviewing for manifest miscarriage of justice, we assess whether "the record is devoid of evidence pointing to guilt," or "the evidence on a key element of the offense is so tenuous that a conviction would be shocking." *McDowell*, 498 F.3d at 312 (internal quotation marks omitted). Under both standards, "we consider the

evidence in the light most favorable to the government, giving the government the benefit of all reasonable inferences and credibility choices." *Id.* (internal quotation marks omitted). Where, as here, the evidence satisfies the less searching *Jackson* standard, it follows that there has been no manifest miscarriage of justice.

### A.     Federal funds element

The federal funds element requires that "the organization, government, or agency receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance." 18 U.S.C. § 666(b). To prove this element, the government elicited testimony from Steven Anderson, the accounting manager for the City of Garland. He testified, in relevant part, as follows:

> Counsel:   And as part of the funding for the City of Garland, does the City also receive assistance from the federal government?
>
> Anderson:  Yes, we do.
>
> Counsel:   Specifically from the years 1998 and each successive 12-month period until the year 2008, did the City of Garland receive more than $10,000 each one of those years?
>
> Anderson:  Yes, we did.

The Browns assert that this testimony, without corroborating documentary evidence, is insufficient to establish that the City of Garland received a minimum of $10,000 in federal funds during the period of the conspiracy. The government responds that "unchallenged testimony from a person highly knowledgeable about and responsible for the city's funding sources easily defeats the [Browns'] challenge to this element."

Both sides agree that *United States v. Jackson*, 313 F.3d 231 (5th Cir. 2002), is the closest case on point. In *Jackson*, as here, the defendants were

convicted of conspiracy to commit theft from a program receiving federal funds and challenged on direct appeal the sufficiency of the evidence supporting the federal funds element. *Id.* at 233. To prove this element, the government offered testimony from the City of Monroe's director of administration that the City received federal grants in the amount of $12,900 and $10,090 for the Louisiana Folk Life Festival. *Id.* at 234. Countervailing testimony was offered by the director of the Louisiana Folk Life Festival, which, together with supporting documentation, "demonstrated unequivocally that the $12,900 funding came from the Northeast Louisiana Arts Council (NELAC)" and that the second grant "was from the Louisiana Endowment for the Humanities (LEH)—not [the National Endowment for the Humanities]." *Id.* at 234–35. Considered in total, the evidence "support[ed] an inference that the City received *some* funding indirectly from [] federal sources," *id.* at 235 (emphasis added), but it was uncertain "*how much* of the grants from local or state agencies were of federal origin, and *when* such funds were received," *id.* at 235, 235–38. Accordingly, the court concluded, there was insufficient evidence from which the jury reasonably could infer—instead of speculate—that at least $10,000 of the funds came from federal sources and was received in the calendar years charged. *Id.* at 238.

The evidence in this case reveals no such uncertainty. The government established that Anderson, the City's accounting manager for the previous two decades, was well informed about the City's finances, accounts, and sources of funding. After clarifying his basis of knowledge, Anderson testified without equivocation that in each of the charged years, Garland received more than $10,000 in federal funding. The defendants did not cross-examine him on this point or offer evidence or argument rebutting it or calling it into question.

The Browns' argument, therefore, reduces to a single contention: that testimony not corroborated by documentary evidence is insufficient as a matter of law to prove the federal funds element. *Jackson* does not stand for that

No. 12-10592

proposition, and defendants have not alerted us to any case that does. To the contrary, other courts have affirmed § 666 convictions against sufficiency challenges where, as here, proof of the federal funds element was established through unchallenged testimonial evidence without corroborating documentary evidence. *See United States v. Robinson*, 663 F.3d 265, 270 (11th Cir. 2011) (evidence "easily" sufficient where director of grants for Chicago Police Department testified that Chicago received a federal grant in the amount of $4.2 million); *United States v. Baldridge*, 559 F.3d 1126, 1133, 1138–39 (10th Cir. 2009) (evidence sufficient where "[t]wo individuals testified that for the fiscal year ending June 30, 2005, Rogers County received . . . a total of $685,464.97" in federal funds); *United States v. Kranovich*, 401 F.3d 1107, 1112–13 (9th Cir. 2005) (evidence sufficient where police sergeant testified that county had been approved for a federal grant of $12,775). We agree that "[a]lthough the government could have easily produced documentation to establish the amount of federal funding, its failure to do so does not preclude a reasonable juror from finding that this jurisdictional qualification was satisfied."[1] *United States v. McAllister,* 141 F.3d 1181, at *1 (9th Cir. 1998) (unpublished); *see also Robinson*, 663 F.3d at 270; *Baldridge*, 559 F.3d at 1133, 1138–39; *Kranovich*, 401 F.3d at 1112–13.

### B.   Nexus element

The crime of theft from a program receiving federal funds requires a "nexus between the criminal conduct and the [organization, government, or]

---

[1] While we conclude that the testimonial evidence here was adequate, we have stressed in the past—and continue to stress today—that it is best practice for the government to provide documentary evidence to corroborate that the amount of federal funds received satisfied the $10,000 threshold under 18 U.S.C. § 666(b). *See Jackson*, 313 F.3d at 238 (emphasizing, when the government did not provide "a single record reference to suggest how much of the $11,500 was of federal origin[,]" that "[t]o meet its burden of presenting evidence from which a jury might properly find an element of a crime proved beyond a reasonable doubt, the government must present more than a mere scintilla of evidence").

agency receiving federal assistance." *United States v. Whitfield*, 590 F.3d 325, 345 (5th Cir. 2009); *United States v. Phillips*, 219 F.3d 404, 413–14 (5th Cir. 2000) (emphasis omitted); *United States v. Moeller*, 987 F.2d 1134, 1137 (5th Cir. 1993) (citation omitted); *see also* 18 U.S.C. § 666 (requiring that the property at issue be "owned by" or "under the care, custody, or control of" an "organization, government, or agency" that "receives, in any one year period, benefits in excess of $10,000 under a Federal program").

The Browns argue that the prosecution did not carry its burden of proving the nexus element because the evidence allows for the possibility that the City had a separate account into which federal funds were deposited and over which Leathers had no control. Assuming *arguendo* that this challenge was properly briefed, it is unavailing. Although the prosecution bears the burden of proving each element of a crime beyond a reasonable doubt, *In re Winship*, 397 U.S. 358, 361–64 (1970), it is not required "to exclude every reasonable hypothesis of innocence; the jury is free to choose among reasonable interpretations of the evidence," *United States v. Perrien*, 274 F.3d 936, 939–40 (5th Cir. 2001). Thus, the government was not required to offer evidence disproving the existence of a hypothetical separate account into which federal funds could have been deposited and over which Leathers might have had no control. *See Perrien*, 274 F.3d at 939–40; *United States v. Guanespen-Portillo*, 514 F.3d 393, 397 (5th Cir. 2008) (rejecting defendants' sufficiency challenge that "the evidence does not exclude the possibility that there was another group in the area at the same time of their arrest").

The Browns argue also that the required nexus is absent because "the money that was used to pay the claims was generated from tax revenue, utility revenue, miscellaneous fees and permits." Assuming *arguendo* the Browns did not disclaim this challenge during oral argument, it, too, falls short. The Supreme Court has held, and we have reiterated, that the required nexus is not

between the property and the federal funding, but between the criminal conduct and the organization, government, or agency receiving federal assistance. *See Salinas v. United States*, 522 U.S. 52, 56–57 (1997) ("The enactment's expansive, unqualified language, both as to the bribes forbidden and the entities covered, does not support the interpretation that federal funds must be affected to violate § 666(a)(1)(B)."); *Whitfield*, 590 F.3d at 345 ("[S]o long as there is a nexus between the criminal conduct and the agency, the lack of a direct connection between the . . . funds under the judges' control and the federal funds in question does not preclude them from being considered agents of the [Administrative Office of the Courts] for the purposes of section 666.") (internal quotation marks and citation omitted); *Phillips*, 219 F.3d at 413–14 ("[A]lthough the conduct prohibited by section 666 need not actually affect the federal funds received by the agency, there must be some nexus between the criminal conduct and the agency receiving federal assistance.") (emphasis omitted) (quoting *Moeller*, 987 F.2d at 1137). The property at issue—here, City funds—"need not be purely federal, nor must the conduct in question have a direct effect on federal funds. The statute possibly can reach misuse of virtually all funds of [a local government]," as long as the government received the requisite federal funding and the agent involved "was authorized to act on behalf of the [government] with respect to its funds." *Phillips*, 219 F.3d at 411. The prosecution established with competent evidence, and the Browns did not offer rebuttal evidence challenging, that (1) Leathers was an agent of the City of Garland, a local government receiving the required amount of federal funding, (2) Leathers was authorized to act on behalf of the City with respect to its funds, and (3) the check-cashing scheme she orchestrated and the Browns facilitated resulted in the loss of more than $1 million in City funds. Consequently, it was reasonable for the jury to conclude from the evidence presented that the government proved the requisite

No. 12-10592

nexus beyond a reasonable doubt. *See Salinas*, 522 U.S. at 56–57; *Whitfield*, 590 F.3d at 345; *Phillips*, 219 F.3d at 413–14; *Moeller*, 987 F.2d at 1137.

### C.    Knowledge element

To prove a federal conspiracy offense, the government must establish, *inter alia*, "the defendant's knowledge of the unlawful objective and voluntary agreement to join the conspiracy." *United States v. Arledge*, 553 F.3d 881, 888 (5th Cir. 2008).  As the district court instructed the jury:

> Mere presence . . . at the scene of an event, even with knowledge that a crime is being committed, or the mere fact that certain persons may have associated with each other, and may have assembled together and discussed common aims and interests, does not necessarily establish proof of the existence of a conspiracy. Also, a person who has no knowledge of a conspiracy, but who happens to act in a way that advances some purpose of a conspiracy, does not thereby become a conspirator.

But "[a] person may be guilty as a co-conspirator even if he plays only a minor role, and he need not know all the details of the unlawful enterprise or know the exact number or identity of all the co-conspirators, so long as he knowingly participates in some fashion in the larger objectives of the conspiracy." *United States v. Westbrook*, 119 F.3d 1176, 1189 (5th Cir. 1997).  "[V]oluntary participation may be inferred from a collocation of circumstances, and knowledge may be inferred from surrounding circumstances." *United States v. Lucas*, 516 F.3d 316, 342 (5th Cir. 2008).  "Once the government has produced evidence of an illegal conspiracy, it need only introduce 'slight evidence' to connect an individual defendant to the common scheme." *Westbrook*, 119 F.3d at 1189–90.

### 1.    Kenneth Brown

Kenneth Brown claims that "[t]here was no evidence that [he] had any knowledge of the scheme that was created by Pat Leathers, Melissa Williams[,] or Jerry Diviney" and that "Diviney and Williams were unequivocal in their testimony that they did not tell [Kenneth] what the checks were for."

11

No. 12-10592

We conclude, to the contrary, that the jury's finding that Brown was aware of the unlawful nature of the check-cashing scheme and knowingly joined it was well supported by the evidence.  At trial, FBI Special Agent Jennifer Mullican testified that Brown admitted to her that he had cashed three fraudulent checks issued in his name.  There is no evidence that Brown had, or believed he had, a legitimate claim against the City; indeed, Brown admitted to Mullican that "he felt that they were doing something wrong so he asked Mr. Diviney to stop having checks issued in his name." That did not stop Brown from cashing checks payable to individuals with whom he was well acquainted and taking his share of the proceeds.  Jerry Diviney, a co-conspirator, testified that when other individuals got "cold feet"—evidence that the scheme's illegality was apparent—Brown agreed to cash checks made out to them and was paid $300–$500 for each check cashed.  The government introduced into evidence more than a dozen such checks.  Thus, it was reasonable for the jury to infer from the above evidence that Brown knew the purpose of the check-cashing scheme and joined it willfully. *See United States v. Fernandez*, 559 F.3d 303, 322 (5th Cir. 2009) (explaining that the defendant's "presence and association is part of the circumstantial evidence that she voluntarily joined the conspiracy," notwithstanding her comparatively minor role); *United States v. Nguyen*, 504 F.3d 561, 570 (5th Cir. 2007) (holding that jury could reasonably conclude from the surrounding circumstances that the defendant knew that a property transaction was illegal, even though she did not structure the transaction or play a role in selling the property, where she voluntarily participated by writing checks and distributing the proceeds).

### 2.   Leah Brown

The same is true for Leah Brown.  The government introduced into evidence two Garland checks totaling more than $11,000 signed by, and made payable to, Leah Brown.  Jerry Diviney testified that Brown cashed those

12

checks, even though she, like her husband, had no legitimate claim against the City. Diviney testified also that he gave Brown a share of the proceeds of the checks she cashed, and that, upon his request, Brown successfully recruited other individuals, including many family members, to take part in the scheme. Evidence that Brown personally cashed fraudulent checks, received a share of the proceeds, and recruited others to take part supports the jury's finding that she knew the purpose of the check-cashing scheme and joined it willfully. *See United States v. Curtis*, 635 F.3d 704, 719–20 (5th Cir. 2011) (finding circumstantial evidence sufficient to establish knowing and willful participation in conspiracy where defendant recruited others and shared in the proceeds); *United States v. Luke*, 152 F. App'x 412, 413–14 (5th Cir. 2005) (per curiam) (unpublished) (affirming conviction for conspiracy against sufficiency challenge where defendant cashed fraudulent checks and shared in the proceeds); *United States v. Ismoila*, 100 F.3d 380, 389 (5th Cir. 1996) (holding that circumstantial evidence established defendant's "role in the illegal scheme was not limited to her marital relationship" with a co-conspirator).

## II.    Sentencing challenges

The Browns next challenge the procedural and substantive reasonableness of their within-Guidelines sentences. Because the Browns preserved these challenges by filing objections to the PSR and renewing their objections during sentencing, we review the district court's interpretations of the Guidelines *de novo*, and the district court's findings of fact for clear error. *United States v. Le*, 512 F.3d 128, 134 (5th Cir. 2007).

### A.    Procedural reasonableness

The Browns contend that the district court made two procedural errors at sentencing. First, they claim that the court erroneously applied a three-level enhancement for their managerial roles in the offense. Second, they assert that

the court attributed to them amounts of monetary loss for which they not are responsible.

### 1.     Managerial role enhancement

The Guidelines provide for a three-level increase to a defendant's base-offense level "[i]f the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(b).  The district court applied this enhancement on the basis of its finding that the Browns assumed "a supervisory role" in the check-cashing scheme by providing the names of new payees and recruiting others to cash checks.  We will affirm the district court's application of the managerial role enhancement "if it is plausible in light of the record read as a whole," *United States v. Nava*, 624 F.3d 226, 229 (5th Cir. 2010), and will reverse "only if, based on the entire evidence, [we are] left with the definite and firm conviction that a mistake has been committed," *United States v. Rose*, 449 F.3d 627, 633 (5th Cir. 2006).

The Browns argue that they were not managers or supervisors of the scheme because, according to them, they did not "engage in decision-making authority on how the scheme was devised or carried out", "recruit accomplices", or "have a large share of the profits."  Their only role, they contend, was to cash checks.

We agree that the Browns were not the ones who conceived of or principally orchestrated the check-cashing scheme, but their role was not so minimal as to disqualify them for the three-level "manager or supervisor" enhancement applied by the district court.  The district court found at sentencing that the Browns "recruited others to act as persons who would cash checks."  That finding is supported by Jerry Diviney's trial testimony that Leah Brown gave him "family or friends' names who were people willing to cash City of Garland checks," by Mark Enloe's trial testimony that he could not remember

whether Diviney or Kenneth Brown recruited him to cash a check, and by evidence that family, friends, and co-workers of the Browns who had no other connection to Diviney or his daughter, Melissa Williams, ultimately become involved in the scheme. That finding is not disproved by the Browns' testimony at sentencing that they did not recruit others; the district court was well positioned to evaluate their credibility and was entitled to reject their testimony as self-serving and inconsistent with the balance of the evidence presented. *See United States v. Sotelo*, 97 F.3d 782, 799 (5th Cir. 1996).

The district court's conclusion that the managerial role enhancement was therefore warranted is not implausible in light of the evidence as a whole, Guidelines commentary that "the recruitment of accomplices" is one factor "court[s] should consider," § 3B1.1(b) cmt. n.4, and our precedent affirming role enhancements for similar conduct, *see United States v. Liu*, 960 F.2d 449, 456 (5th Cir. 1992) (finding no clear error in district court's application of "manager or supervisor" enhancement to defendant responsible for finding accomplices to join, and customers to fund, an immigration fraud scheme); *see also United States v. Ramcharan*, 83 F. App'x 667, 671 (5th Cir. 2003) (per curiam) (unpublished) (finding no clear error in district court's application of "manager or supervisor" enhancement where the defendant recruited family members to join an insurance fraud conspiracy and directed them in the filing of fraudulent claims).

### 2.    Loss calculation

The Guidelines "create[] a sliding scale that increases the defendant's base offense level by zero to thirty [levels] depending on the amount of [actual or intended] loss." *United States v. John*, 597 F.3d 263, 279 (5th Cir. 2010) (citing U.S.S.G. § 2B1.1(b)(1)). They provide for a ten-level increase if the offense results in a loss of more than $120,000 but less than $200,000, U.S.S.G. § 2B1.1(b)(1)(F); and a twelve-level increase if the offense results in a loss of more $200,000 but less than $400,000, U.S.S.G. § 2B1.1(b)(1)(G). The district court

adopted the PSR's calculation that Kenneth Brown was responsible for a $304,553.62 loss and Leah Brown was responsible for a $142,554.48 loss; found, based on their particular involvement in the conspiracy, that those loss amounts were "reasonably foreseeable" to each defendant; and adjusted upward their offense levels accordingly.

A district court's loss calculation, and its embedded determination that the loss amount was reasonably foreseeable to the defendant, are factual findings reviewed for clear error. *United States v. Hebron*, 684 F.3d 554, 560 (5th Cir. 2012) (loss calculation reviewed for clear error); *United States v. Hull*, 160 F.3d 265, 269 (5th Cir. 1998) (foreseeability determination reviewed for clear error). The district court need only make "a reasonable estimate of the loss," *Hebron,* 684 F.3d at 560 (citing § 2B1.1 cmt. n.3(C)), and, given the "unique position" it occupies to assess the loss amount, its loss calculation is entitled to appropriate deference, *id*.

### a.    Kenneth Brown

The district court attributed to Kenneth Brown a loss amount of $304,553.62 based on the fourteen checks he cashed and twenty-five checks made payable to his friends, associates, and family members. Kenneth Brown contends that he "should only have been held responsible for the loss amount of the checks he actually endorsed."

Brown's position that he is not responsible for checks cashed by others participating in the scheme is contradicted by U.S.S.G. § 1B1.3(a)(1)(B), which provides that a defendant is responsible for "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." The district court's finding that the loss resulting from the checks cashed by other members of the conspiracy was reasonably foreseeable to Brown is well supported. Brown recruited others to join, cashed checks when others backed out, and was a central cog in the conspiracy: his spouse, children, sister, aunt,

No. 12-10592

cousins, in-laws, business partner, employees, and friends cashed one or more fraudulent checks.

### b.   Leah Brown

The district court attributed to Leah Brown a loss amount of $142,554.48 based on the two checks she cashed and sixteen checks made payable to her friends, associates, and family members. She contests this amount on the sole basis that "[t]he evidence was insufficient to show [that she] acted in concert with others or participated in a jointly undertaken criminal activity." Her specific challenge that she is not liable for a loss amount of $142,554.48 because she was not involved in the conspiracy is foreclosed by our earlier conclusion that the evidence supports her conviction for conspiracy.

### B.   Substantive reasonableness

Having concluded that their sentences are procedurally sound, we turn to the Browns' contention that their within-Guidelines sentences of forty-two months and thirty-four months of imprisonment are substantively unreasonable.

Properly calculated within-Guidelines sentences enjoy a presumption of reasonableness that "is rebutted only upon a showing that the sentence does not account for a factor that should receive significant weight, it gives significant weight to an irrelevant or improper factor, or it represents a clear error of judgment in balancing sentencing factors." *United States v. Cooks*, 589 F.3d 173, 186 (5th Cir. 2009) (citation omitted). The Browns do not point to any sentencing factor improperly omitted from consideration or given inappropriate weight; they assert, without elaboration, that their sentences were "clearly unreasonable" considering their "entire li[ves], background, lack of criminal history, education, [and] all of the information contained in the PSR." The district court took into consideration their personal circumstances when weighing the § 3553(a) factors and arriving at sentences it deemed "sufficient but not greater than necessary to comply with the statutory purposes" of

17

punishment.    The Browns give us no reason to disturb the district court's considered judgment. *See United States v. Diaz*, 637 F.3d 592, 604 (5th Cir. 2011) (holding that defendant failed to rebut the presumption of reasonableness where, contrary to the defendant's objection, the record reflected that "[t]he district court did take into account [his] personal history"); *United States v. Ruiz*, 621 F.3d 390, 398 (5th Cir. 2010) ("A defendant's disagreement with the propriety of the sentence imposed does not suffice to rebut the presumption of reasonableness that attaches to a within-guidelines sentence.").

## CONCLUSION

For the foregoing reasons, the convictions and sentences of Kenneth and Leah Brown are AFFIRMED.